UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| MARIE A. LAM, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | )  Civil Action No. 12-10992-LTS |
|  | ) |
| PNC MORTGAGE and NATIONAL | ) |
| CITY MORTGAGE d/b/a ACCUBANC | ) |
| MORTGAGE, | ) |
|  | ) |
| Defendants. | ) |

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

September 14, 2015

SOROKIN, J.

Plaintiff Marie Lam, acting pro se, brought this suit against PNC Bank, National Association, alleging claims stemming from the foreclosure of her home.[1] Before the Court is Defendant PNC Bank, National Association's ("PNC") Motion for Summary Judgment on all of Lam's claims. Doc. No. 48. Lam has opposed the motion. Doc. No. 57. PNC has replied to Lam's opposition, Doc. No. 66, and the Court held a hearing on the motion. See Doc. No. 63 (setting the date for a motion hearing). For the reasons that follow, PNC's Motion for Summary Judgment is ALLOWED on all counts.

I.    FACTS

---

[1] Lam's Amended Complaint also names National City Mortgage, d/b/a Accubanc Mortgage ("National City"), as a defendant. Doc. No. 2 ¶ 2. However, "PNC Bank succeeded National City Mortgage Co. by merger with National City Bank in November of 2009," id. ¶ 3, meaning PNC is the only defendant in this case.

This recitation of undisputed facts relies principally upon the Local Rule 56.1 Statement of Undisputed Material Facts. See Doc. No. 50. The Court reserves certain facts for the discussion of particular claims to which they are relevant. On August 31, 2001, Lam obtained a loan ("Loan") from National City Mortgage Co. ("National City"), subsequently succeeded by merger by PNC, for $242,585.00 plus interest. Id. ¶¶ 1, 2, 7. Lam secured the Loan via a mortgage on property located at 11 Russell Terrace, Newburyport, Massachusetts ("Property"). Id. ¶ 3. The parties modified the Loan on June 3, 2004. Id. at ¶ 5. Lam experienced financial difficulties shortly thereafter, and filed a petition for relief under Chapter 13 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts. Id. ¶ 9. On March 31, 2009, the Bankruptcy Court entered an order discharging Lam as debtor from this Bankruptcy Action, which Lam had converted to a Chapter 7 bankruptcy a little over four months earlier. Id. ¶¶ 10, 11.

In April 2010, Lam decided to sell the Property. Id. ¶ 16. On May 3, 2010, she signed a repayment agreement with PNC. Id. ¶ 13. The agreement stipulated, inter alia, that the arrearage was $82,512.49, and that this included $10,277.95 in "Attorney's Fees and Costs." Doc. No. 52-7 at 2. Eight days later, on May 11th, she sought a Loan payoff statement from PNC. Id. ¶ 17. PNC sent the payoff statement, which Lam received shortly thereafter, the next day. Id. ¶ 18. The payoff statement claimed that the balance payoff due, as of May 28, 2010, was $300,576.86. Id. This amount included a line item for legal fees and costs, valued at $10,075.24. Id. Lam sent PNC a letter on May 30, 2010 disputing the legal fees expense, which she claimed was discharged in bankruptcy. Id. ¶ 19. On August 17, 2010, PNC sent Lam a letter denying her request for hardship assistance, and thus continuing normal loan servicing, on the grounds that Lam purportedly failed to remit payments in accordance with the repayment plan. Id. ¶ 15.

That same month, Lam rejected an offer to purchase the Property for $338,000, an amount sufficient to fully pay off the Loan. Doc. No. 50 ¶¶ 20, 21. The next month, she rejected a second offer sufficient to pay off the Loan, this one for $332,000. Id. ¶¶ 22, 23. Later that month, Lam took the Property off the market. Id. ¶ 24. On April 25, 2012, Lam received a notice from PNC, dated April 9, 2012, that PNC had scheduled a foreclosure sale on the property at 9:00 a.m. on May 9, 2012. Id. ¶ 25. No foreclosure sale has taken place at this point. Doc. No. 51 ¶ 16.[2]

On May 8, 2012, Lam filed a lawsuit against PNC in the Commonwealth of Massachusetts Superior Court, County of Essex. Doc No. 50 ¶ 26. PNC removed the case to this Court on June 4, 2012. Id.

II.     LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party "has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). The Court is "obliged to []view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation."

---

[2] In her response to PNC's Statement of Undisputed Material Facts, Lam disputed the contention that there was no foreclosure sale, saying that an auctioneer did in fact come to her house. Doc. No. 59 ¶ 27. However, she acknowledged at the hearing that, notwithstanding this visit, no actual foreclosure sale has taken place.

Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina–Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  A court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Because Lam is proceeding pro se, this Court construes her filings liberally. See Rodi v. S. New England Sch. of Law (1st Cir. 2004) ("[T]he fact that the plaintiff filed the complaint pro se militates in favor of a liberal reading.").  Even so, "pro se status does not insulate a party from complying with procedural and substantive law." Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997).

III.   DISCUSSION

Lam's Amended Complaint alleges nine claims for relief against PNC: 1) Violation of Mass. Gen. Laws ch. 93A, §§ 2 and 9; 2) Misrepresentation; 3) Breach of Covenant of Good Faith and Fair Dealing; 4) Fraud; 5) Breach of Contract; 6) Unjust Enrichment; 7) Breach of Duty of Good Faith and Reasonable Diligence; 8) Violation of Mass. Gen. Laws ch. 183C; and 9) Violation of 15 U.S.C. § 1692(c).  See Doc. No. 2 at 3-7.  PNC moves for summary judgment on all counts.  See Doc. No. 48.  Lam's response does not attempt to rebut PNC's motion on a claim-by-claim basis.  See generally Doc. No. 57.  Therefore, this Court will treat PNC's motion for summary judgment for the claims that Lam does not respond to as unopposed.  Nevertheless, because "[i]t is well-settled that 'before granting an unopposed summary judgment motion, [this Court] must inquire whether the moving party has met its burden,'" Aguiar-Carrasquillo v. Agoso-Alicea, 445 F.3d 19, 25 (1st Cir. 2006) (quoting Lopez v. Corporacion Azucarera de

Puerto Rico, 938 F.2d 1510, 1517 (1st Cir. 1991)), this Court will consider the merits of PNC's motion for all nine claims.

    A.    **Chapter 93A Claims**

Lam's first claim is that PNC violated Mass. Gen Laws ch. 93A, §§ 2 and 9, by "act[ing] in an unfair and deceptive manner towards [her] by intentionally failing to respond to [her] requests for payoffs in order to charge her extra interest in fees." Doc. No. 2 ¶ 14. For Lam to prevail on this claim, she must "prove that the defendant's unfair or deceptive act caused an adverse consequence or loss." Rhodes v. AIG Domestic Claims, Inc., 961 N.E.2d 1067, 1076 (Mass. 2012). Lam must demonstrate more than "[a] mere breach of contract," but rather must show misconduct "ris[ing] to the level of 'commercial extortion' or a similar degree of culpable conduct." Commercial Union Ins. Co. v. Seven Provinces Ins. Co., Ltd., 217 F.3d 33, 40 (1st Cir. 2000).

As discovery has revealed, the gravamen of Lam's Chapter 93A claim has shifted from the allegation that she did not receive any payoff statement to the contention that PNC sent her an inaccurate payoff statement. See Doc. No. 52-1 at 27. She contends that both the arrearages figure, Doc. No. 59 at 4, and the legal fees she purportedly owed, Doc. No. 52-1 at 27, were inaccurate. In her opposition, Lam enumerates two more theories for recovery. First, she asserts that PNC's "canell[ation of a] Forbearance Plan within a few days even though partial payment was made" was unfair and deceptive. Doc. No. 57 at 3. Second, she characterizes as unfair and deceptive PNC's denial of a reinstated modification, even after Lam added her husband to the

5

application, providing a second income. Id. at 4. The Court will address the merits of each of these in turn.[3]

      i. *Inaccurate Arrearages*

Lam alleges that the $82,512.49 amount that PNC claimed she owed as of April 21, 2010 was inaccurate, and that this inaccuracy was unfair and deceptive. Doc. No. 57 at 4. She claims that her son and her sister made payments during 2006 and 2007 on her behalf. Id. Lam has produced numerous bank statements for her checking account, Doc. No. 57-2, as well as a spreadsheet, Doc. No. 57-1, indicating such payments. At summary judgment, construing the facts in the light most favorable to Lam, this evidence supports an inference that Lam's son and sister did in fact send those payments to PNC on her behalf during that time.

However, this evidence is insufficient to overcome PNC's motion. At most, Lam has demonstrated that someone made payments on her behalf to PNC within that date range. The bank records demonstrate neither that PNC failed to credit the account, nor that the arrearages amount was inaccurate, as they do not prove that Lam had otherwise kept up with her payment requirements. Moreover, even assuming that the payments were not in fact credited, that mere inaccuracy is not sufficient for a Chapter 93A violation. Lam would need to show evidence of PNC acting "unethical[ly] or unscrupulous[ly]," as opposed to mistakenly, even negligently so. Wasserman v. Agnastopoulous, 497 N.E.2d 19, 23 (Mass. 1986). The evidence underscores Lam's inability to demonstrate this, as nine days before she received the payoff statement, she signed the repayment agreement, acknowledging the very amounts she now challenges. See Doc No. 52-7 at 2. Without evidence of the requisite bad faith, this theory fails.

---

[3] The last two of these theories are procedurally barred, as Lam did not raise them until her opposition. See Calvi v. Knox County, 470 F.3d 422, 431 (1st Cir. 2006) ("The short of it is that . . . [Plaintiff] was not entitled to raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment."). Nevertheless, for the sake of thoroughness, the Court proceeds to address the merits of each of these theories.

ii.  *Legal Fees*

Lam further alleges that PNC acted unfairly and deceptively when it included a line item on the payoff letter for attorneys' fees. Doc. No. 2 ¶ 14. She contends that her bankruptcy discharged these fees. See Doc. No. 52-1 at 29. This theory suffers from two defects. First, as noted earlier, even assuming Lam's interpretation of bankruptcy law is correct, she has not produced any evidence that PNC's "incorrect" inclusion of the legal fees in the payoff statement was anything more than a mistake, something insufficient for Chapter 93A liability. See Commercial Union, 217 F.3d at 40.

Second, and more importantly, Lam is incorrect that her bankruptcy proceeding meant she no longer owed those fees. In Johnson v. Home State Bank, the Supreme Court observed that "a bankruptcy discharge extinguishes only one mode of enforcing a claim—namely, an action against the debtor in personam—while leaving intact another—namely, an action against the debtor in rem." 501 U.S. 78, 84 (1991) (emphasis added); accord In re Drake, 4 B.R. 11, 20 (Bankr. D. Mass. 2010) ("[A] Chapter 7 discharge extinguishes only the personal liability of the debtor and a secured creditor's in rem right to pursue the collateral attached to the claim survives or passes through bankruptcy.") (internal quotations and citations omitted). Since PNC had the right to collect on its claim against Lam via an in rem action, and attempts to do so via foreclosure, PNC's inclusion of the legal fees in the payoff statements, far from being unfair or deceptive, was also correct. As a result, PNC's Motion for Summary Judgment is ALLOWED as to this theory.

iii.  *Denial of Reinstated Modifications*

In her opposition, Lam contends that PNC acted unfairly and deceptively in not qualifying her for a reinstated modification in May 2012, even though her proposal at that time

7

also featured her husband, thus increasing the income level.  Doc. No. 57 at 4.  Even if, arguendo, Lam was entitled to a modification as a result of the extra income (something she has not produced any evidence of), there is no evidence showing that PNC's denial was the result of "unethical or unscrupulous" conduct.  Wasserman, 497 N.E.2d at 23.  Therefore, this theory too falls short, and PNC's motion is ALLOWED for this count.

        iv.      *Cancellation of the Forbearance Plan*

In her opposition, Lam also claims that PNC acted unfairly and deceptively when it cancelled a Forbearance Plan she entered into with PNC upon failure to fully tender the first month's payment when it was due on December 15, 2009.  Doc. No. 57 at 3.  Lam asserts that an official at PNC informed her that making a partial payment would suffice, so long as she tendered the balance by the following January.  Doc. No. 62 at 1.  At the motion hearing, she presented a check showing payment for that balance, dated December 26, 2009.

Drawing all inferences in Lam's favor, the Court assumes both that Lam's conversation with the PNC official occurred, and that her understanding of that conversation was correct.  Nevertheless, she still fails to meet her burden.  First, notwithstanding this cancellation, she still received a subsequent modification, in May 2010.  See Doc. No. 50 ¶ 13.  Second, Lam has produced no evidence showing that but for the cancellation, she would be current on her payments.  Her inability to make payments in accordance with the 2010 modification plan underscore this.  See Id. ¶ 15.  Third, she struggles to show damages, as PNC has not yet foreclosed on the house.  See Doc. No. 51 ¶ 16.  Given this, PNC's motion is ALLOWED for this theory as well.

    B.    **Misrepresentation Claim**

8

Lam's second claim is for misrepresentation. She asserts that PNC misrepresented both the payoff figure on the Property, and that her payments were attributed to her mortgage. Doc. No. 2 ¶¶ 17, 18. In light of Lam acting pro se, the Court construes this misrepresentation claim as a negligent misrepresentation claim, as Lam also alleges a fraud claim against PNC later in the Amended Complain. Doc No. 2 ¶ 23; see Castro v. United States, 540 U.S. 375, 381 (2003) ("Federal courts sometimes will ignore the legal label that a pro se litigant attaches to a motion and recharacterize the motion in order to place it within a different legal category. They may do so in order . . . to create a better correspondence between the substance of a pro se motion's claim and its underlying legal basis.").

To prevail on this claim, Lam "must establish that the defendant, (1) in the course of her business, or in a transaction in which she had a pecuniary interest, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance on the information, and that she (6) failed to exercise reasonable care or competence in obtaining or communicating the information." DeWolfe v. Hingham Ctr., Ltd., 985 N.E.2d 1187, 1192 (Mass. 2013). The evidence cannot support such a claim.

First, similar to the problems that plague her 93A claim, Lam has not produced any evidence showing that anything in the payoff statement was in fact inaccurate. The fact that the legal fees were not in fact discharged in bankruptcy underscores this point. Second, even if the amounts were incorrect, it was not unreasonable for PNC to presume otherwise, as Lam had signed the repayment modification document, stipulating to the amounts, only nine days prior. See Doc. No. 50 ¶ 13.

9

Finally, Lam cannot meet the element of justifiable reliance. The only evidence supporting the assertion that she relied on the inaccuracies in the payoff statement to her pecuniary detriment comes from her deposition, where she said she took her house off the market, notwithstanding two offers, both of which would have fully paid off her loan, even the higher amount PNC said she owed, because she "couldn't get a payoff figure." Doc. No. 52-1 at 32, 35. However, this alone is not enough for two reasons. First, Lam was not correct when she said she "couldn't get a payoff figure," since, as she acknowledged elsewhere in that same deposition, she did receive a payoff statement, she just disagreed with the balance it gave. Id. at 27. And second, even if Lam was correct about the payoff statement being inaccurate, it still was unreasonable for her to not consummate a sale of her Property for an amount sufficient to pay off the loan, even at PNC's higher amount, solely because she felt she would be entitled to more of the surplus sale price than she would otherwise get according to the payoff statement. In light of this, Lam fails at her burden at this stage, and PNC's motion is ALLOWED for this count.

C. **Breach of Covenant of Good Faith and Fair Dealing Claim**

Lam's third claim for relief is that, "by giving her false and misleading information; not attributing payments towards the mortgage; [and] not giving foreclosure prevention counseling pursuant to 12 U.S.C. § 1701," PNC breached the covenants of good faith and fair dealing. Doc. No. 2 ¶ 20. She also alleges that PNC did not fulfill its "obligation under the covenant of good faith and fair dealing to consider foreclosure alternatives once they had received [her] TARP funds." Id. ¶ 21. Under Massachusetts law, "[e]very contract implies good faith and fair dealing between the parties to it." T.W. Nickerson, Inc. v. Fleet Nat. Bank, 924 N.E.2d 696, 703 (Mass. 2010) (quoting Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 820 (Mass. 1991)). The covenant "requires that neither party shall do anything that will have the effect of destroying

10

or injuring the right of the other party to the fruits of the contract." Id. at 570 (internal citation and quotation omitted). The covenant is not unlimited in scope, but rather "is only as broad as the contract that governs the particular relationship." Id. (quoting Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 684 (Mass. 2005)). Lam "has the burden of proving a lack of good faith." Id.

Lam's first two theories of liability for a breach of this covenant, that PNC gave false and misleading information, and failed to attribute payments towards her mortgage, fail for the same reasons her other claims have failed. She has produced no evidence, let alone evidence sufficient to overcome summary judgment, that PNC was even incorrect in any information they gave, let alone acted in bad faith.

Lam also argues that PNC's failure to consider alternatives to foreclosure breached the covenant. Binding precedent bars this theory. In MacKenzie v. Flagstar Bank, FSB, 738 F.3d 486 (1st Cir. 2013), the First Circuit faced a case similar to this one. The plaintiffs alleged, inter alia, that their mortgagee breached the covenant of good faith and fair dealing by foreclosing on their home without considering foreclosure alternatives. Id. at 490-91. The plaintiffs relied on both a general duty of good faith that mortgagees owe mortgagors, and on the agreement their mortgagee had with the federal government to engage in foreclosure alternatives before foreclosing. Id. at 491; see id. at 489 ("[The mortgagee] signed a Service Participation Agreement ('SPA') with Fannie Mae (acting as the agent of the United States Department of the Treasury), agreeing to participate in HAMP. SPAs require loan servicers to offer loan modifications and foreclosure prevention services pursuant to HAMP guidelines.").

The Court rejected both arguments. Addressing the agreement with the government, the Court held that individual "borrowers are not third-party beneficiaries of agreements between

mortgage lenders and the government," and that unless the agreement in question manifests a separate intent, borrowers cannot sue to enforce the agreement. See id. at 491-92. As a borrower of a party which has an agreement with the government, Lam falls under MacKenzie's scope, and, with no evidence of a separate intention, this theory of liability fails.

MacKenzie also precludes the general duty contention. The Court rejected the reasoning of Bankruptcy Court and District Court opinions that found such a duty, saying that what governs the scope of the covenant is the specific contract in question, and the contract in MacKenzie had no provision for foreclosure alternatives. Id. at 493. Similarly, Lam's contract with PNC has no such requirement. See Doc. No. 59 ¶ 13. In this scenario, then, the general scope of the covenant, to protect the mortgagor's interests when exercising a power of sale, applies. MacKenzie, 738 F.3d at 493. Given that no foreclosure sale has taken place, Doc. No. 51 ¶ 16, this contention falls short.

Lastly, this Court notes that any claim Lam may have against PNC for violating 12 U.S.C. § 1701X, the National Housing Act, is likewise barred under First Circuit law, as that statute contains no private right of action. Falzarano v. United States, 607 F.2d 506, 511 (1st Cir. 1979). In light of this, PNC's motion is ALLOWED for this count.

D.     **Fraud Claim**

Lam's fourth claim against PNC is for fraud, specifically that PNC both "knowingly gave false information about the status of payments and the foreclosure amount," and "failed to give [her] the figure in time for her to sell the subject property." Doc. No. 2 ¶ 23. "Under Massachusetts law, fraud requires that the defendant made a knowingly false statement concerning a material matter that was intended to, and did in fact, induce the plaintiff's reliance and, through that reliance, created an injury." Woods v. Wells Fargo Bank, N.A., 733 F.3d 349,

12

357-58 (1st Cir. 2013) (citing Russell v. Cooley Dickinson Hosp., Inc., 772 N.E.2d 1054, 1066 (2002)).

The same difficulties plaguing some of Lam's other claims also arise here. As mentioned before, Lam has failed to produce evidence that PNC, assuming the payoff statement's inaccuracy, made that statement with the requisite state of mind. Moreover, she has not produced any evidence that the payoff statement was actually false at all, as her evidence only indicates that she sent payments to PNC, not that they were not credited to her account, or that she was otherwise current on her payments. Further, the evidence belies her claim that PNC defrauded her to induce her to not sell and instead face foreclosure, as its debt would have been fully paid off with a sale, and PNC's recovery from any foreclosure sale would be limited to the unpaid balance. Duclersaint v. Fed. Nat. Mortg. Ass'n, 696 N.E.2d 536, 538 (Mass. 1998) ("Generally, a mortgagee must give a mortgagor any surplus generated at a foreclosure sale.") (citing Mass. Gen. Laws ch. 183, § 27). As a result, the motion is ALLOWED on this count.

### E. **Breach of Contract Claim**

Lam's fifth claim, for breach of contract, relies entirely on PNC's purported failure to comply with the National Housing Act and HAMP regulations. See Doc. No. 2 ¶¶ 28, 29. As mentioned earlier, the Act does not confer a private right of action, Falzarano, 607 F.2d at 511, and Lam does not have standing to assert any failure to comply with HAMP guidelines, MacKenzie, 783 F.3d at 491-92. For these reasons, the motion is ALLOWED for this claim.

### F. **Unjust Enrichment Claim**

Lam's sixth claim, for unjust enrichment, alleges that PNC was "unjustly enriched by [her] uncredited mortgage payments and the additional interest and fees charged for failing to give [Lam] her payoff figure when asked." Doc. No. 2 ¶ 31. The First Circuit has interpreted

Massachusetts law as requiring that a plaintiff prove: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value." Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (citing 26 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 68:5 (4th ed. 1993)).

Lam cannot meet these elements. First, as mentioned earlier, there is no evidence that the payments were in fact uncredited. Second, Lam received the payoff statement one day after she requested it, undermining the contention that any additional interest and fees accrued. Doc No. 50 ¶¶ 17-18. Third, equity points against Lam here, as she specifically signed the repayment agreement recognizing the amount of arrearages PNC claimed she owed as correct. See id. ¶ 13. For these reasons, the motion is ALLOWED for this count.

G. **Breach of Duty of Good Faith and Reasonable Diligence Claim**

Lam's seventh claim against PNC is that it breached the duty of good faith and fair dealing "[b]y its inaction and failure to give her the correct payoff figure." Doc. No. 2 ¶ 34. The duty requires "a mortgagee in exercising a power of sale . . . [to] act in good faith and . . . use reasonable diligence to protect the interests of the mortgagor." Figueroa v. Fed. Nat. Mortg. Ass'n, No. 12-11290-RWZ, 2013 WL 2244348, at *3 (D. Mass. May 20, 2013) (internal citations and quotations omitted). The mortgagee satisfies that duty if it "complies with the Massachusetts statutes governing foreclosure sales, unless the mortgagee's conduct manifested fraud, bad faith, or the absence of reasonable diligence in the foreclosure sale process." Id.

This claim fails as a matter of law because "this duty requires effort and attention by the mortgagee to conduct the sale of the property fairly and in good faith through the observance of

14

procedural requirements of the statutes and the mortgage." Seppala & Aho Const. Co., Inc. v. Petersen, 367 N.E.2d 613, 619 (Mass. 1977) (emphasis added); see also Figueroa, 2013 WL 2244348, at *3 ("[T]he mortgagee's duty of good faith and reasonable diligence is focused on its conduct of the foreclosure sale."); cf. Payton v. Wells Fargo Bank, N.A., No. 12-11540-DJC, 2013 WL 782601, at *3 (D. Mass. Feb. 28, 2013) ("Because [the defendant bank] has not yet exercised the power of sale, there cannot be any plausible claim that the mortgagee has failed to exercise such power in good faith or exercise reasonable diligence to protect the interests of the mortgagor."). As no foreclosure sale has taken place, Doc. No. 51 ¶ 16, something Lam acknowledged at the motion hearing, this case falls outside that duty, and the motion is ALLOWED on this count.

H. **Chapter 183C Claim**

Lam's eighth claim is that PNC, "by making unreasonably risky loans that are unfair and/or unconscionable, . . . lending based on the value of the collateral, and making a home mortgage loan secured by [her] principal residence under circumstances where [PNC] could not have reasonably known and ascertained" whether Lam could make the payments, violated Mass. Gen. Laws ch. 183C.[4] Chapter 183C applies to certain types of mortgages, called "high-cost home mortgages," and imposes certain requirements on lenders before they can issue such loans. For example, lenders must "first receiv[e] certification from a counselor with a third-party nonprofit organization," approved by certain agencies, "that the borrower has received counseling on the advisability of the loan transaction." Mass Gen. Laws ch. 183C, § 3. Further, lenders must reasonably believe, based off a borrower's "current and expected income, current and expected obligations, employment status, and other financial resources other than the

---

[4] Any violation of this statute would also constitute a per se violation of Mass. Gen. Laws ch. 93A. Mass. Gen. Laws ch. 183C, § 18(a).

15

borrower's equity in the [home securing the loan]," that the borrower can make the scheduled payments. Id. ch. 183C, § 4. Failure to follow some of these provisions can render a loan unenforceable. See id. ch. 183C, § 3.

Chapter 183C defines a "high-cost home mortgage loan" as a loan "secured by the borrower's principal dwelling, other than a reverse mortgage transaction," that meets one of two conditions. The first condition is that the interest rate, for a first-lien loan (such as this one), is eight percentage points higher than "the yield on United States Treasury securities having comparable periods of maturity." Id. ch. 183C, § 2. The second condition is if, with certain exceptions not relevant here, "the total points and fees exceed the greater of 5 per cent of the total loan amount or $400." Id. Because Lam has not produced any evidence to show that the interest rate is too high, such as what the comparable Treasury rate was, and because the evidence supports, if anything, that the rate was sufficiently low,[5] there is no genuine dispute that this condition is not met.

Regarding the second condition, the Court assumes without deciding that a potential Chapter 183C claim accrued with not only the original 2001 loan, but the 2004 modification and the 2010 repayment agreement as well. Cf. Deutsche Bank Nat. Trust Co. v. Fox, 971 F. Supp. 2d 1106, 1118 (M.D. Fla. 2013) ("The closing date for the loan modification agreement was in May of 2011. As such, [plaintiff] had until May of 2012 to bring a T[ruth in Lending Act] claim."). The Court also assumes, without deciding, that the line item for $10,277.95 of "Attorney Fees and Costs" in the 2010 repayment agreement, counts as "points and fees" for the

---

[5] The introductory interest rate was 5.500%, Doc No. 52-2 at 1, and the adjusted rate was calculated at 2.750% above the "Current Index," rounded to the nearest 0.125%. Id. at 2. The Current Index, in turn, was "the weekly average yield on United States Treasury Securities adjusted to a constant maturity of one year." Id. at 1. There is no evidence in the record to indicate that this Current Index would be so much higher than the comparable Treasury security that the adjusted rate would exceed the 8% cushion, even though the Current Index only received a 2.75% increase in calculating the rate.

purpose of determining if a particular mortgage is high-cost. See In re Thomas, 447 B.R. 402, 410 (Bankr. D. Mass. 2011) (holding "that the entire . . . charge for attorney's fees constitutes points and fees"); but see Bottcher v. Emigrant Mortg. Co., Inc., No. WOCV200901776, 2012 WL 6616938, at *2 n. 5 (Mass. Supp. Sept. 20, 2012) (excluding attorney's fees from the points and fees calculation).

Even these assumptions cannot save Lam's claim. The evidence indicates that the principal amount of the Loan is $242,585.00. Doc No. 59 ¶ 2.[6] Five percent of this amount is $12,129.25. The amount of attorney's fees PNC charged to Lam does not reach this threshold. In light of this, the Loan is not a "high-cost home mortgage," meaning Chapter 183C does not apply. Given that, the motion is ALLOWED for this count.

I.     **Fair Debt Collection Practices Act ("FDCPA") Claim**

Lam's final claim is that, "by failing to give [Lam] her payoff figure in time to have a sale of the subject property and in failing to credit [her] with payments, raising the payoff figure and adding in additional costs and fees after delaying the receipt of the payoff figure," Doc. No. 2 ¶ 39, PNC "violated 15 U.S.C. § 1692(c) by acting unconscionable [sic] in their efforts to collect the mortgage debt." Id. ¶ 38. The Fair Debt Collection Practice Act ("FDCPA") holds liable "debt collectors who fail[] to comply with any provision of [the Act]." 15 U.S.C. § 1629(k). Thus, the FDCPA applies only to people who are "debt collectors."

Because PNC is not a debt collector, it is entitled to summary judgment on this count. The FDCPA exempts from the definition of debt collectors, subject to an exception not relevant here, "any person collecting or attempting to collect any debt owed . . . to the extent such activity . . . (ii) concerns a debt which was originated by such person." Id. § 1692(a)(6)(F)(ii);

---

[6] The Court uses this amount because it is the smallest possible principle balance, meaning it produces the lowest possible threshold for the amount of fees necessary for the Loan to be a high-cost mortgage.

17

Chiang v. Verizon New England Inc., 595 F.3d 26, 41 (1st Cir. 2010) ("Creditors collecting on their own accounts are generally excluded from the statute's reach.").  Since PNC is attempting to collect on a debt National City, whom PNC succeeded by merger, originated, PNC is not acting as a debt collector.  See Phillips v. PNC Bank, NA, No. 3:12-cv-207, 2012 WL 6114743, at * 4 (S.D. Ohio Dec. 10 2012) ("National City Bank merged with PNC. . . . Accordingly, PNC acquired Plaintiff's loan through its merger with National City and PNC therefore stands in National City's shoes as a creditor, not a debt collector subject to the FDCPA.").  Therefore, the motion is ALLOWED for this count.

IV.     CONCLUSION

For the reasons set forth above, the Court ALLOWS PNC's Motion for Summary Judgment (Doc. No. 48) for all the claims in Lam's Complaint.  Accordingly, the Court will enter judgment in PNC's favor, and the Clerk will close the case.

                          SO ORDERED.

                          /s/ Leo T. Sorokin
                          Leo T. Sorokin
                          United States District Judge